IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GREGORY LOUIS KIERCZAK, | CASE NO. 3:22–cv–00320–JRK |
| Plaintiff, | DISTRICT JUDGE JAMES R. KNEPP II |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Gregory Louis Kierczak filed a Complaint against the Commissioner of Social Security seeking judicial review of its decision denying Kierczak Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

**Procedural History**

In April 2019, Kierczak filed an application for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of December 21, 2018, Tr. 324–339, and claiming that he was disabled due to a gunshot wound to the head which resulted in traumatic brain injury, left

neglect with impaired visual interpretation,[1] general sensory impairment on his left side, comprehension difficulties, fatigue, movement limitations due to sight loss, and limitations in brain interpretation. Tr. 382. The Commissioner denied Kierczak's applications at the initial level and upon reconsideration. Tr. 180–197, 203–211. Kierczak requested a hearing before an administrative law judge (ALJ). Tr. 216.

In October 2020, ALJ Allison Dietz took testimony from Kierczak but determined during his testimony that an additional medical assessment of Kierczak's vision was necessary for her to thoroughly consider Kierczak's claims. Tr. 116–118. ALJ Dietz paused the proceedings and referred Kierczak to a consultative examiner for that purpose. Tr. 118.

In September 2021, ALJ Earl Ashford presided over the continuation of the hearing, at which Kierczak and vocational expert Marie Barhydt testified. Tr. 39–91. In October 2021, ALJ Ashford issued a written decision finding that Kierczak was not disabled. Tr. 16–31. The ALJ's decision became final at the end of December 2021 when the Appeals Council declined further review. Tr. 1–3, *see* 20 C.F.R. § 404.981.

---

[1] According to the Moody Neurorehabilitation Institute, "left neglect" is a deficit in awareness that occurs following an injury to the right side of the brain. *What is Left Neglect?*, MoodyNeuro.com, https://www.moodyneuro.org/what-is-left-neglect/ (last visited December 21, 2022). Because of such an injury, "the brain has difficulty paying attention to items falling into the left hemisphere." *Id*.

**Factual History**[2]

In December 2018, after sustaining a gunshot wound to the back of his head, Kierczak was brought to ProMedica Hospital in Toledo, Ohio, for emergency medical treatment. Tr. 1074, 1089, 1835–6. Doctors performed a craniotomy and temporarily removed a flap of bone from Kierczak's skull to relieve intercranial pressure. Tr. 1075, 1102, 1106, 1110, 2030. They placed Kierczak in a coma to aid in his recovery and ultimately, replaced the bone flap. Tr. 1835, 2030.

In January 2019, Kierczak was released for inpatient care at a rehabilitation center. Tr. 746, 751.

In March 2019, Kierczak was transferred to a skilled nursing facility. Tr. 901, 2030.

In May 2019, Kevin A. Reinard, M.D., a clinician at the skilled nursing facility, wrote of Kierczak's progress:

> [Kierczak] has made a remarkable recovery and is reaching near complete functional independence. Subjectively, he is doing well. He reports no headaches, seizures[], nausea, fevers, weakness, or issues with balance and coordination. He has a baseline neglect and field cut related to his [gunshot wound]. He has no drift. Motor examination was 5/5 in all four extremities…. From my standpoint he carries no restrictions.

Tr. 2041. Dr. Reinard indicated that Kierczak was ready to be discharged and supported Kierczak relocating to his mother's home in Arizona upon his

---

[2] I have limited my discussion of the facts to those that are relevant to the arguments presented by the parties.

3

release. *Id*. In June 2019, Kierczak was discharged and he moved to Phoenix, Arizona. Tr. 2030–2031.

In July 2019, consultative examiner Amanda Nellis, Ph.D., conducted a psychological evaluation and opined as to Kierczak's residual functional capacity (RFC).[3] Tr. 2187–2198. Dr. Nellis noted that Kierczak arrived at the appointment accompanied by his mother. *Id*. Kierczak told Dr. Nellis that he has difficulty with short-term memory and concentration, and also with his vision in his left eye. *Id*. He needs the assistance of others to read. *Id*. Kierczak reported instability in his mood, which was marked by episodes of anger and irritability. *Id*.

Dr. Nellis completed a medical source statement for Kierczak finding, in pertinent part, that Kierczak's "visual memory and delayed memory capabilities [were] within the Extremely Low range," that "[o]n some tasks, [Kierczak] exhibited visual spatial difficulties related to his brain injury," and that "information provided in a visual context would be difficult for him to remember or understand." Tr. 2197. Dr. Nellis noted that Kierczak was pleasant and cooperative during the evaluation and "would attempt to get

---

[3] An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard c. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Agency's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

4

along with supervisors and co-workers but his quality of interactions would be mood-state dependent." *Id*.

In August 2019, consultative examiner Lise Labarre, M.D., conducted a physical evaluation of Kierczak and opined as to his RFC. Tr. 2030–2037. Kierczak told Dr. Labarre that his thinking, comprehension, and alertness had consistently improved, especially in the past few months. Tr. 2031. He indicated that he could not "see well from his left side" and expressed concern that this would prevent his return to work as an equipment operator. Tr. 2031. When Dr. Labarre and Kierczak discussed his diagnosis of left side neglect, Kierczak indicated that he did not believe his symptoms were particularly consistent with that diagnosis. *Id*.

Dr. Labarre completed a medical source statement for Kierczak and opined, in pertinent part, that he had "very significant improvement in his overall condition" and "very significant improvement with respect to motor coordination, strength, sensation, etc." Tr. 2035. "In particular," Dr. Labarre found "no evidence of any left-sided neglect," and explained that "[i]ndividuals with neglect of one side of the body will dress only the opposite side of the body and they ignore anything being done to the side which they are neglecting." *Id*. Contrasting those individuals with Kierczak, Dr. Labarre noted, "[Kierczak] moved both sides of his body symmetrically" and "did not ignore his left side in any way." Tr. 2031. Kierczak told Dr. Labarre that he had blurred vision in his left eye; Dr. Labarre recommended that he see an ophthalmologist to address

5

that and assess whether he has optic atrophy or any chronic damage to the optic nerve. *Id*. Dr. Labarre found that Kierczak "definitely" had left homonymous hemianopsia,[4] which she noted "may have been missed" by his previous clinicians. Tr. 2031. Dr. Labarre explained that while Kierczak's limited field of vision was "readily noted," Kierczak could access the right side of both of his eyes by turning his head slightly to the left. Tr. 2032–2033.

In August 2020, neurologist Eduardo T. Calderon, M.D., wrote a letter on Kierczak's behalf indicating that it was his "medical opinion" that "Kierczak [was] unable to work due to [a] history of head injury with residual vision loss and seizures."[5] Tr. 2100, 2099–2133, 2149–2186.

---

[4]  According to the Cleveland Clinic's online Diseases & Conditions database, homonymous hemianopsia is "a condition in which a person sees only one side—right or left—of the visual world of each eye." *See* https://my.clevelandclinic.org/health/diseases/15766-homonymous hemianopsia- (last visited December 22, 2022). The definition continues:

> Under normal circumstances, the left half of the brain processes visual information from both eyes about the right side of the world. The right side of the brain processes visual information from both eyes about the left side of the world. In homonymous hemianopsia, an injury to the left part of the brain results in the loss of the right half of the visual world of each eye. An injury to the right part of the brain produces loss of the left side of the visual world of each eye.

*Id*.

[5]  Dr. Calderon's findings and opinions do not warrant further discussion beyond this footnote. Dr. Calderon's letter does not pertain to the issues raised by the parties, except to the extent that it acknowledges Kierczak's uncontested loss of vision. Also, the ALJ found that the medical evidence does not support Dr. Calderon's opinion and deemed it unpersuasive, a finding that Kierczak does not contest. Lastly, a claimant's ability to work is an issue

In February 2021, ophthalmologist Blair Clark, D.O., examined Kierczak and opined as to his RFC. Tr. 2134–2148. Dr. Clark indicated that Kierczak has had complete left homonymous hemianopia, which affects both eyes, for two to three years. Tr. 2135–2136. Dr. Clark indicated that Kierczak's left homonymous hemianopia is a permanent condition resulting in the loss of the left half of his visual field in both eyes. Tr. 2136. Dr. Clark noted that Kierczak's eyes have good visual acuity but that Kierczak's homonymous hemianopia removes his ability to see the entire left half of his peripheral field of vision. Tr. 2136. Dr. Clark continued that Kierczak's condition doesn't affect the clarity of his focus or cause him to experience double vision, depth perception problems, or tunnel vision. Tr. 2138. He noted that to compensate for his lost left peripheral field of vision, Kierczak needs to turn his head to the left to access that field of vision. *Id.* Dr. Clark opined that this condition would likely cause Kierczak to tire easily when reading and would not allow him to drive.[6] Tr. 2139.

---

reserved to the Commissioner under the guidelines provided by 20 C.F.R. § 404.1520b(c)(3). Dr. Calderon's opinion is thus neither "inherently … valuable nor persuasive." 20 C.F.R. § 404.1520b(c).

[6]  Dr. Clark also wrote that, "in his professional opinion," Kierczak's visual field loss "would make it difficult to work." As with Dr. Calderon's opinion, Dr. Clark's opinion of Kierczak's ability to work is neither "inherently valuable nor persuasive." *See* 20 C.F.R. § 404.1520b(c).

## The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. Kierczak meets the insured status requirements of the Social Security Act through December 31, 2023.

2. Kierczak has not engaged in substantial gainful activity since December 21, 2018, the alleged onset date. 20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*

3. Kierczak has the following severe impairments: traumatic brain injury, status post-surgery for gunshot wound, neurocognitive disorders, left neglect/left homonymous hemianopia (visual field defect) and right eye optic atrophy with good visual acuity, and seizure. 20 CFR 404.1520(c) and 416.920(c).

4. Kierczak does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

5. Kierczak has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that Kierczak cannot climb ladders, ropes, or scaffolds. He can frequently use the bilateral upper extremities for reaching and handling. He must avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, and unprotected heights. He requires a well-lit work environment and no jobs requiring left peripheral acuity. He can perform simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts, involving only work-related decisions, with few if any workplace changes. He can occasionally interact with the public, coworkers, and supervisors.

6. Kierczak is unable to perform any past relevant work. 20 CFR 404.1565 and 416.965.

7. Kierczak was born in 1984 and was 34 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. 20 CFR 404.1563 and 416.963.

8. Kierczak has at least a high school education. 20 CFR 404.1564 and 416.964.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Kierczak is "not disabled," whether or not Kierczak has transferable job skills. *See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2.

10. Considering Kierczak's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Kierczak can perform. 20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a).

11. Kierczak has not been under a disability, as defined in the Social Security Act, from December 21, 2018, through the date of this decision. 20 CFR 404.1520(g) and 416.920(g)).

Tr. 16–31.

At step four, the ALJ discussed the psychological assessment of consultative examiner Amanda C. Nellis, Ph.D.:

> The claimant reports he needs reminders for self-care tasks, slow or no comprehension due to TBI, difficulty talking, completing tasks, understanding, following instructions, getting along with others and difficulties with memory and concentration. [Tr. 35.] Consultative examiner Amanda C. Nellis, Ph.D., interviewed the claimant in July 2019 for a psychological evaluation in connection with this application. [Tr. 2038–2044.] The claimant reported difficulty with short-term memory and concentration, mood instability, with anger and irritability. His mood negatively affected his relationships with others, and he could not control anger episodes resulting in a verbal altercation on public transportation. He did not interact with others, fearing something bad could happen. As for concentration and attention difficulties, external stimuli could distract him and believed he was slower to perform mental and physical tasks than most individuals his age. He described some symptoms of hypervigilance related to the traumatic incident. He required reminders and could get lost after walking a few streets away from his home (at a time when he had just moved to Arizona with his mother). His mother accompanied him to the interview and reported he became disoriented and walked into walls or into people because of visual spatial difficulties. The claimant spent most of his day at home with his mother and stepfather, did some household chores, swimming in

9

> their pool and playing with the dogs. He had not engaged in activities of interest since relocating to Arizona but enjoyed going out to dinner with his family. Dr. Nellis offered diagnosis of mild neurocognitive disorder due to traumatic brain injury and unspecified trauma and stressor-related disorder.
>
> The severity of the claimant's mental impairment does not meet or medically equal the criteria of listings 12.02 (*neurocognitive disorders*) and 12.15 (*trauma and stressor-related disorders*). In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> In understanding, remembering, or applying information, the claimant has a moderate limitation. On some tasks during the psychological evaluation in July 2019, the claimant exhibited visual spatial difficulties, at time required repetition of instructions. He would be able to understand most verbal instructions but would have difficulty remembering complex information or worklike procedures [Tr. 2187–2198.]

Tr. 22–23. Dr. Nellis's opinions contributed to the ALJ's step-five analysis:

> Consultative examiner Amanda C Nellis, PhD, saw the claimant in July 2019 for a psychological evaluation that yielded diagnoses of mild neurocognitive disorder due to traumatic brain injury and unspecified trauma and stressor-related disorder. Dr. Nellis offered an assessment of function that is consistent with the evidence of record and based standardized testing that support her findings. The opinion of Dr. Nellis is persuasive and provides support to the residual functional capacity herein.

Tr. 28. Also at step five, the ALJ also considered Kierczak's vision issues and Dr. Clark's opinions:

> [Dr. Clark] examined Kierczak in February 2021 and diagnosed left homonymous hemianopia, a visual field defect that affects both eyes. Remaining vision in the left eye was 20/60 uncorrected,

and 20/40 in the right eye, uncorrected. Dr. Clark indicated the condition must have been present two to three years and is permanent, resulting in visual field loss of the left half in both eyes. While visual acuity remained good in both eyes, he had a loss of peripheral vision. The condition does not affect the ability to focus clearly but would need to turn the head to the left to use the remaining sight visual field. While Kierczak could read some, he would have to turn the head to the left and would likely tire easily. Dr. Clark opined the loss of peripheral vision would not allow for him to drive and would make it difficult to work. [Tr. 2134–2148].

… Due to vision limitations, he must work in a well-lit environment and work tasks must not require left peripheral acuity. Residual symptoms of neurocognitive impairment are addressed in the residual functional capacity as discussed above.

… [Dr. Clark] completed a questionnaire regarding Kierczak's vision. While visual acuity is good, the loss of left peripheral vision does not allow for Kierczak to drive and would make it difficult to work [Tr. 2134–2139]. The undersigned finds this opinion persuasive and supportive of the exclusion of commercial driving in this finding as well as other restrictions such as no work tasks involving left peripheral acuity and the need for a well-lit work environment.

Tr. 27, 28.

## Standard for Disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

11

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal

standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

The order governing the Court's review of this matter instructs that "[e]ach fact" asserted in the Statement of Facts section of Plaintiff's brief "shall

be supported by a *specific reference to the transcript page number on which that fact is found.*" Doc. 5, at 4 (emphasis added). The order also instructs that the argument section of Plaintiff's brief "must address each of the Commissioner's findings that plaintiff claims does not have the support of substantial evidence *by citing specific references to the evidence in the transcript* supporting's arguments." Doc. 5, at 4 (emphasis added). These are not optional suggestions. They are mandatory requirements and serve to provide the Defendant with adequate notice to aid the Court's review.

Despite these mandatory requirements, large portions of Kierczak's brief are devoid of citations to the record. For instance, the three paragraphs in Kierczak's argument section that run from the middle of page 16 to the middle of page 18, contain two pages of assertions but only three record citations. This is perhaps the result of the fact that Plaintiff has lifted portions of his argument nearly verbatim from a brief he filed below with the Appeals Council. *Compare* Tr. 474–76, *with* Doc. 10, at 15–18.

But there's another problem. Kierczak presents only one issue: whether the ALJ constructed a flawed hypothetical when questioning the vocational expert about Kierczak's vision. *See* Doc. 10, at 3, 15. One might expect Kierczak's brief to direct the reader to the page of the record that contains the allegedly flawed hypothetical. But the portion of Kierczak's statement of facts in which he discusses the ALJ's hypotheticals—the paragraph starting on page five that begins with the ungrammatical phrase "ALJ's first hypothetical was

14

individual has RFC for sedentary exertional level, no climbing of ladders, ropes, or scaffolds"—contains no record citations. And Kierczak's argument leaves one to guess where the allegedly flawed hypothetical can be found.

So Kierczak has waived the only issue he presents by failing to support it with record citations and by failing to explain where in the record the error he alleges can be found.[7] *Cf. Al-Najar v. Mukasey*, 515 F.3d 708, 717 (6th Cir. 2008) ("His argument is made without citation to either the record or to any case law and is therefore waived.").

Even if Kierczak had not waived this issue, however, he would fare no better. As noted, Kierczak's only argument is that the ALJ constructed a flawed hypothetical when questioning the vocational expert about Kierczak's vision.

As far as I can tell, Kierczak's entire claim is based on a February 10, 2021 report prepared by his optometrist, Blair Clark, D.O. *See* Doc. 10, at 15–16 (discussing Dr. Clark's report). Dr. Clark reported that Kierczak has "left homonymous hemianopia," a "visual field defect" that "affect[s] both eyes." Tr. 2135. Kierczak seizes on this report and asserts that the ALJ failed to appreciate that Kierczak's right eye was also affected by his condition. Doc.

---

[7] In addition to the omissions noted above, Kierczak provides no support for his assertions on page 20 of his brief, the assertion at the bottom of page 21, and those on page 25. I'm thus not considering what he asserts in those portions of his brief.

15

10, at 15 ("ALJ's assumes only **ONE EYE IS INVOLVED, AND ONLY ONE EYE HAS LOSS OF FIELD OF VISION**. This is incorrect.").[8]

Kierczak, however, ignores the fact that even a casual comparison of ALJ's decision and Dr. Clark's report reveals that the ALJ accurately recited the contents of Dr. Clark's report. *Compare* Tr. 27, *with* Tr. 2135–39. So the ALJ was aware of what Dr. Clark had found.

Indeed, the ALJ confirmed with Kierczak during the hearing—with reference to what "*your doctor*," i.e. Dr. Clark, "said"—that both of his eyes were affected. Tr. 51–52 (emphasis added). So the ALJ knew what Dr. Clark reported.

Moreover, Dr. Clark's report was not the only medical evidence about Kierczak's eyes. The ALJ also considered evidence from Dr. Labarre, who diagnosed Kierczak with a "left homonymous hemianopsia," noting that to overcome this limitation in his field of vision, Kierczak need only "turn his head slightly to the left to see from the "right side" *of both eyes*. Tr. 26 (emphasis added).

It may be that Kierczak is also challenging the ALJ's step-five determination that he can "use [his] bilateral upper extremities[9] for reaching

---

[8] In this report and recommendation, I've reproduced Plaintiff's brief as written. Kierczak relies heavily on underlining and bolding, apparently believing that shouting will help persuade the Court. It won't. *See* Antonin Scalia & Bryan A. Garner, Making Your Case, The Art of Persuading Judges, 122 (2008).

[9] *Bilateral upper extremities* are what most people refer to as "arms."

16

and handling." *See* Doc. 10, at 18. Kierczak's counsel says, "Counsel argues the limitations on frequent bilateral reaching and handling set forth by ALJ, Tr.24, are not supported by substantial evidence when vocationally considered proper visual limitations." *Id*. "Counsel [also] argues both reaching and handling would be much slower, plaintiff would have difficulty keeping up with requirements, and none of this was considered by ALJ." But counsel's surmise is not evidence, *see Camaj v. Holder*, 625 F.3d 988, 992 n.3 (6th Cir. 2010), and, in any event, is not supported by anything that might lead to the conclusion he asserts.

Finally, late in his brief, Kierczak offers a new argument, unrelated to the ALJ's hypothetical. Kierczak notes the July 2019 psychological evaluation performed by Dr. Nellis, Doc. 10, at 22–23, *see* Tr. 2187–99, and faults the ALJ for "disregard[ing] much of [Dr. Nellis's] findings," Doc. 10, at 23. Citing page 28 of the record, Kierczak says that the ALJ's "assessment in summarizing Dr. Nellis is poor at best." Doc. 10, at 23. According to Kierczak, the "ALJ stated [that] her opinion was consistent evidence, but failed to indicate the evidence he was referring too. At best, ALJ cherry picked her opinion and failed to incorporate much of her findings inconsistent with lesser restrictive Finding No.5." Doc. 10, at 23.

Aside from the fact that this argument has nothing to do with the issue asserted in the heading introducing Kierczak's argument, *see* Doc. 10, at 15,

17

the biggest problem with this argument is that it is based on Kierczak's misreading of the record. It is true that the ALJ briefly discussed Dr. Nellis's opinion at page 28. But Kierczak ignores the ALJ's lengthy, earlier discussion of Dr. Nellis's opinion at pages 22 and 23 of the record.

## Conclusion

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: December 28, 2022

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).